IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



F I L E
MAR 3 0 2011
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA

v.                                    Criminal No. 3:10cr249

SAMUEL J.T. MOORE, III

## MEMORANDUM OPINION

This matter is before the Court on the Defendant's MOTION TO SUPPRESS (Docket No. 9). For the reasons that follow, the motion will be denied.

## BACKGROUND

In August 2007, Virginia state officials began two separate investigations into illegal activities at Club Velvet, a "gentleman's club" in Richmond, Virginia that was owned and operated by the defendant, Samuel J.T. Moore, III ("Moore"). The Virginia Alcohol and Beverage Commission ("ABC") initiated an undercover investigation after receiving complaints that Club Velvet was connected to multiple ABC violations, including allowing intoxication of underage customers and employees, serving alcohol after hours, and allowing fully nude lap dances, all of which are unlawful. Two undercover ABC agents visited Club Velvet once in August 2007, twice in September 2007, and

once again in October 2007. The agents observed violations of each kind of conduct about which complaints had been made.

On the second front, Richmond Police Department ("RPD") Detective Sergeant Steve Ownby ("Sgt. Ownby") initiated a separate investigation on August 27, 2007 when he interviewed an individual, Cooperating Witness-1 ("CW-1"), who revealed information that Moore and Club Velvet were engaged in illegal narcotics and prostitution activities. CW-1's knowledge was based on her work as a dancer at the club from late spring 2006 through August 2007. In addition, she formerly had been the defendant's "girlfriend." CW-1 later testified before the Multijurisdictional Grand Jury ("MJGJ") for the City of Richmond, County of Henrico, County of Hanover, and the County of Chesterfield on November 14, 2007.

Spurred by CW-1's information respecting the alleged prostitution and drug activities, and Moore's personal funding of the automatic teller machines ("ATMs") at Club Velvet, Sgt. Ownby contacted IRS Special Agent Robin Rager ("Agent Rager") of the federal Internal Revenue Service on August 31, 2007, and requested her assistance with respect to the financial components of the investigation. Sgt. Ownby testified that the investigation encompassed everything that might result from narcotics and prostitution activities, including tying down the money that was generated by those activities. Sgt. Ownby and

Agent Rager had worked together previously during other investigations, and Sgt. Ownby knew she had expertise that would be helpful in analyzing financial aspects of the investigation.

Based on his collection of information over the next month or so, Sgt. Ownby contacted the prosecutor assigned to the MJGJ, Shannon Taylor, about the possibility of a MJGJ investigation into the alleged illegal activities occurring at Club Velvet. Around the same time, the ABC authorities separately contacted Ms. Taylor about their investigation and suspicions concerning illegal activities at Club Velvet. Ms. Taylor put the ABC agents, specifically Brian Porter and Susan Day, in communication with Sgt. Ownby, who thereafter took the lead in the investigation and coordinated the overall direction of the case.

The joint RPD and ABC efforts were targeted at corroborating CW-1's statements, exploring the full scope of the alleged narcotics and prostitution violations, and investigating the alleged ABC violations. To that end, with the assistance of Sgt. Ownby and the RPD, the ABC agents visited Club Velvet undercover on four more occasions between December 1, 2007 and February 12, 2008 with Cooperating Witness-2 ("CW-2"), an informant who had worked previously with one of the ABC agents. Agent Rager assisted by evaluating bank account records that had been subpoenaed by the MJGJ regarding financial transactions

associated with Moore's suspected narcotics and prostitution activities.

On November 14, 2007, Agent Rager opened up an IRS "Primary Investigation" grounded in potential money laundering offenses. The opening of a federal investigation allowed Agent Rager to provide assistance and resources to Sgt. Ownby's state investigation and to account for her time for administrative purposes. Though opening the Primary Investigation would have allowed Agent Rager to access Moore's tax returns on file with the IRS, she made no such inquiry until after the state search warrant had been executed. Agent Rager assisted in the remainder of Sgt. Ownby's state investigation by analyzing bank records, attending state meetings, and assisting in surveillance of Club Velvet during the undercover visits by the ABC Agents.

By mid-February 2008, Sgt. Ownby began to prepare for the execution of a search warrant. However, when a mother contacted the RPD on February 20, 2008, complaining that her underage daughter had an inappropriate sexual relationship with Moore, the execution date for the warrant was accelerated to the early morning hours of February 23, 2008. Sgt. Ownby personally drafted the supporting single-spaced, nine-page affidavit detailing the information provided by CW-1, the investigators' efforts to corroborate her information through investigation, and the four final undercover visits to Club Velvet by the ABC

agents and CW-2. The affidavit and warrant contain no mention of tax evasion or making and subscribing a false tax return; rather, the warrant directed officers to search for evidence relating to the following offenses:

> Va. Code § 18.2-346, Prostitution; 18.2-347, Residing in a bawdy place; 18.2-348, Aiding prostitution or unlawful sexual intercourse; 18.2-357, Receiving money from earnings of male or female prostitute; 18.2-361, Crimes against nature; 18.2-246.3, Money laundering;[1] 18.2-248, Distribution of a controlled substance; and, Richmond City Code § 66-249, Public Nudity.

Gov't Ex. 1, p. 1. Attachment 3 to the warrant contains a list of the items to be seized during the execution of the warrant, including bank records, financial statements, invoices, expense records, business operation records, to name a few. At the time of the warrant's application and execution, Sgt. Ownby, Ms. Taylor, and Chief Deputy Commonwealth's Attorney for the City of Richmond, Matthew Geary, intended to use the evidence recovered during the search in aid of state charges to be brought against Moore.

Sgt. Ownby and Mr. Geary presented the search warrant application to City of Richmond Circuit Court Judge Richard D. Taylor, the judge presiding over the MJGJ, for consideration on

---

[1] The actual citation in the warrant was to Va. Code § 18.2-346.3. Gov't Ex. 1, p. 1.

February 22, 2008. Judge Taylor approved the warrant that afternoon.

From a prosecution standpoint, Ms. Taylor and Mr. Geary supervised the search warrant and its execution. The United States Attorney's Office ("USAO") was not involved in the search. However, a Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Agent tasked with assisting in the search, called then-Assistant United States Attorney ("AUSA") Chuck James ("James") and asked if he could communicate with James should questions arise during the warrant's execution, to which James replied affirmatively. James had no other involvement in the operation, did not review the warrant materials, and received no call from the ATF Agent in connection with the search. Sgt. Ownby, Ms. Taylor, and Mr. Geary were not aware of the ATF Agent's contact with James.

Because Club Velvet was a three-story building with a basement, because it was expected that the search would yield a substantial volume of documentary evidence to be catalogued, and because there would be a substantial number of employees at the club when the warrant was to be executed, the RPD lacked sufficient staff to conduct the document-intensive search and to manage the search in an orderly fashion. Also, Sgt. Ownby decided that it was necessary to keep search preparation completely secret, even from other RPD sections. Therefore,

Sgt. Ownby, with the blessing of state prosecutors, contacted the IRS and ATF for assistance in executing the warrant. Sgt. Ownby was the lead officer on the search.

The federal officials involved were ten IRS-CID agents who were assigned to search specific areas in Club Velvet and tasked with assisting the RPD in cataloguing the documentary evidence, and four ATF agents who were assigned to each of the floors to assist with the recovery of any firearms.

Officers executed the warrant in the early morning hours of February 23, 2008 under the supervision of Sgt. Ownby, Mr. Geary, Ms. Taylor, and one other state prosecutor. All evidence was logged into RPD Property Section to be physically held there.

After the search, Sgt. Ownby reviewed the evidence and continued investigating Moore's activities. Ultimately, Moore pleaded guilty to three state misdemeanor charges, though he was never charged with any of the state offenses listed in the warrant. On February 4, 2010, the ABC revoked Club Velvet's alcohol license in light of the evidence gathered during the state investigation.

Agent Rager also continued to assist in the state investigation, reviewing the financial evidence gathered during the search. Upon her review of Moore's Daily Sheets, tax returns, and a Dance Watcher book, she recognized that she had

evidence that Moore had filed false tax returns, and had evaded payment of federal income taxes. Only at that time did Agent Rager initiate an IRS investigation into Moore's tax activities, thereby involving the USAO, which opened a case against Moore on March 18, 2008. On April 4, 2008, a federal grand jury issued a subpoena to the RPD to provide all of the yield from the search conducted under the state warrant. On September 7, 2010, a federal grand jury returned an indictment against Moore, charging him with two counts of making and subscribing a false tax return. On October 6, 2010, a federal grand jury returned a superseding indictment, adding one count of tax evasion to the two previous counts.

### DISCUSSION

1. **Applicability of Federal Rule of Criminal Procedure 41(b) to the State Search Warrant**

   A. **Sgt. Ownby did not Apply for the Search Warrant at the Direction or Urging of Agent Rager, Nor was the Search Warrant Application a Federal Proceeding Requiring Compliance with Fed. R. Crim. P. 41**

The heart of Moore's motion to suppress lies in his contention that the search was federal in nature because Sgt. Ownby sought the warrant at the direction and urging of Agent Rager, because fourteen federal agents participated in the search of Club Velvet, and because AUSA James promised to be on call to an ATF Agent during the warrant's execution. Therefore,

according to Moore, the warrant was "federal in nature." Suppression of the evidence is required, says Moore, because Sgt. Ownby "obtained the state warrant as a pretext to search for evidence of federal crimes, in an intentional and deliberate disregard of Rule 41(b)(1)." Def.'s Mem. in Supp. of Mot. to Suppress at 13.

Rule 41(b)(1) states:

> At the request of a federal law enforcement officer or an attorney for the government . . . a magistrate judge with authority in the district -- or if none is reasonably available, a judge of a state court of record in the district -- has authority to issue a warrant to search for and seize a person or property located within the district.

Fed. R. Crim. P. 41(b)(1). The Fourth Circuit has addressed Moore's argument on four separate occasions, the most recent decision having issued in April of last year.

First, in United States v. Johnson, 451 F.2d 1321 (4th Cir. 1971), the Fourth Circuit concluded that Rule 41 had not been violated because, even though state officers conferred with federal agents about the investigation, the federal agents did not assist in obtaining the warrant, join in the search though present during it, seize evidence, or interrogate suspects, id. at 1322. The agents were present "simply as observers and . . . did not participate in the search." Id.

The Fourth Circuit addressed the issue again in United

States v. Smith, 914 F.2d 565 (4th Cir. 1990), wherein the defendant contended that the search was a federal one because a Drug Enforcement Administration ("DEA") agent was present during the search, and after the search, the matter became largely a federal prosecution, id. at 569. In rejecting the defendant's theory, the Fourth Circuit found that a state officer spearheaded the search and that there was no evidence that the state officer had applied for the warrant at the direction or urging of a federal officer. Id. The presence of the DEA agent, though he assisted in luring the defendant from his room, was insufficient to render the search a federal one. Id.

Two years later, in United States v. Williams, 977 F.2d 866 (4th Cir. 1992), the defendants argued that the search warrant obtained by a state detective was invalid because the state officers initially intended to prosecute the defendants federally, and the county magistrate was an improper source for a federal warrant, id. at 869-70. On that record, the Fourth Circuit determined that there was no evidence that the warrant had been applied for at the direction, or urging, of a federal agent. Id. at 870. In fact, the only federal agent present during the search was there as an observer, and there was no evidence that the state officers initially intended to prosecute the case federally. Id. Thus, Rule 41 was not applicable to the warrant. Id.

Most recently, in <u>United States v. Claridy</u>, 601 F.3d 276 (4th Cir. 2010), the Fourth Circuit rejected the defendant's argument that evidence should have been suppressed because "a federally deputized Baltimore City police officer, participating in a joint task force, obtained the warrant from a state court judge before an attempt was made to obtain it from a federal magistrate judge," in violation of Rule 41(b), <u>id.</u> at 278. The officers of the joint federally-funded, federal-state law enforcement task force conducted extensive surveillance of the defendant before Baltimore City Detective Gladstone obtained a search warrant from a Maryland state court judge. <u>Id.</u> The task force included both agents of the DEA and Baltimore City and Baltimore County police officers. <u>Id.</u> at 279.

The Fourth Circuit first reaffirmed its previous holdings that Rule 41 requires that a federal law enforcement officer, or someone at his direction or urging, apply for a warrant covered by the Rule. <u>Id.</u> at 281. The Fourth Circuit then turned its attention to analysis of "when Rule 41 applies in obtaining search warrants during the course of a joint federal-state law-enforcement investigation into violations of both federal and state law." <u>Id.</u> at 281. Ultimately, the Fourth Circuit's analysis of that question focused on the fact that the Federal Rules of Criminal Procedure govern criminal proceedings, and the

defendant's argument, like that of Moore, focused on the character of the _investigation_, rather than on the appropriate trigger for application of Rule 41 -- a finding that the _proceeding_ was a federal proceeding.  Id.

"Criminal investigations are not 'proceedings' in United States courts or state courts, subject to court rules," announced the court, "but rather [are] a function of the law enforcement officers in the Executive Branch. . . . Rule 41's application must hinge on whether the _proceeding_, as distinct from the investigation, was federal."  Id. (emphasis supplied). When federal and state agencies cooperate, forming a joint law-enforcement effort, investigating violations of state and federal law, an application for a search warrant cannot categorically be deemed a "proceeding" governed by Rule 41 "based simply on the role that federal law-enforcement officers played _in the investigation_."  Id. at 282 (emphasis supplied). Furthermore, requiring state warrants to comply with Rule 41 in every joint investigation would "'place officers acting jointly on the horns of a dilemma in deciding whether to charge state or federal crimes.  Such officials should be free to make a considered choice based on the best available information and unencumbered by merely technical procedural rules.'"  Id. (quoting _United States v. Sellers_, 483 F.2d 37, 44 (5th Cir. 1973)).  Thus, when determining whether Rule 41 governs an

application for a search warrant in state court -- i.e., a
judicial proceeding -- by a member of a joint task force, "it is
not only relevant to understand the role of federal officers in
obtaining the warrant and conducting the search, but it is also
<u>necessary</u> to review the details of the proceeding itself to
determine what law the warrant will serve and the scope of the
warrant." <u>Id.</u> (emphasis supplied).

In applying these standards to the facts of the case, the
Fourth Circuit found that "the application for the search
warrant initiated a state proceeding governed by state law and
[] it was not a federal proceeding governed by Rule 41(b)." <u>Id.</u>
at 283. The Maryland judge had commanded the state detective to
make his return to the state judge, not to a federal magistrate
judge as required under Rule 41, and there was no evidence that
the return was then forwarded to the Clerk in the federal court
in accordance with Rule 41. <u>Id.</u>

Thus, in the present case, Moore had to demonstrate, under
the long-established test in the Fourth Circuit, that Sgt. Ownby
applied for the search warrant at the direction or urging of
Agent Rager before the warrant becomes subject to the
requirements of Rule 41(b). Moore has not met this burden.
Though he claims that the evidence is "overwhelming," all he
offered in his papers and during the evidentiary hearing are the
assertions that Sgt. Ownby and Agent Rager spoke on numerous

occasions about the investigation, the need for a search warrant, and what the warrant should contain. It is true that Sgt. Ownby and Agent Rager spoke about the investigation, but that is to be expected because Agent Rager assisted in the investigation. Moreover, Sgt. Ownby testified that he personally drafted the warrant and affidavit. Moore presented no evidence to suggest anything to the contrary. In short, Moore presented no evidence showing that Sgt. Ownby sought the warrant at the direction or urging of Agent Rager.

Moreover, even if the Government had conceded that Sgt. Ownby and Agent Rager engaged in a joint investigative effort, Moore could not meet the burden under Claridy's "proceeding" test. Sgt. Ownby made an application for the search warrant to a judge of the Circuit Court for the City of Richmond, presenting probable cause to believe that Moore was violating Virginia's narcotics, prostitution, and money laundering laws, as well as a City of Richmond ordinance prohibiting public nudity. The state judge issued the warrant, directing "any policeman of a county, city or town . . . to search" Club Velvet and to seize relevant evidence located during the search. Gov't Ex. 1, p. 1. The warrant further commanded that the inventory of evidence be produced before the Circuit Court for the City of Richmond. Id. Because the warrant alleged violations of state law, the state judge's authority to issue the warrant and

supervise its return was conferred by Virginia Code §§ 19.2-52[2]

and 19.56,[3] and the authority of Sgt. Ownby to execute the

warrant came as his position as a policeman of Richmond, Va --

the city in which the place to be searched was located.   Thus,

even if the Court were to find that Sgt. Ownby and Agent Rager

---

[2]   Section 19.2-52 provides:

> Except as provided in § 19.2-56.1, search
> warrants, based upon complaint on oath
> supported by an affidavit as required in §
> 19.2-54, may be issued by any judge,
> magistrate or other person having authority
> to issue criminal warrants, if he be
> satisfied from such complaint and affidavit
> that there is reasonable and probable cause
> for the issuance of such search warrant.

Va. Code Ann. § 19.2-52.

[3]   Section 19.2-56 states, in relevant part:

> Every search warrant shall be directed to
> (i) the sheriff, sergeant, or any policeman
> of the county, city or town in which the
> place to be searched is located, (ii) any
> law-enforcement officer or agent employed by
> the Commonwealth and vested with the powers
> of sheriffs and police, or (iii) jointly to
> any such sheriff, sergeant, policeman or
> law-enforcement officer or agent and an
> agent, special agent or officer of the
> Federal Bureau of Investigation, the Bureau
> of Alcohol, Tobacco and Firearms of the
> United States Treasury, the United States
> Naval Criminal Investigative Service, the
> United States Department of Homeland
> Security, any inspector, law-enforcement
> official or police personnel of the United
> States Postal Inspection Service, or the
> Drug Enforcement Administration.

Va. Code Ann. § 19.2-56.

engaged in a joint investigative effort, Moore's motion fails because the application for a search warrant "initiated a state proceeding governed by state law and [] it was not a federal proceeding governed by Rule 41(b)." Id.

Moore argues that Claridy should not control the outcome of his motion because it involved a joint federal-state investigation. Def.'s Mem. in Supp. of Mot. to Suppress at 9 n.4. In addition, he posits in his reply that Claridy is not controlling because Virginia's law with respect to who may be issued a search warrant is more restrictive than that of Maryland, the state law the Fourth Circuit considered in Claridy. Def.'s Reply in Supp. of Mot. to Suppress at 1-3.

It is true that the circumstances in Claridy involved a joint federal-state task force, but the Fourth Circuit also reaffirmed its long-standing rule that there must be evidence that a federal law enforcement officer, or someone at his direction or urging, applied for a warrant in order for it to be subject to Rule 41(b). As discussed above, Moore presented no evidence to meet that burden other than assertions that Sgt. Ownby and Agent Rager spoke about the need for, and specifics of, a warrant.

Apart from the lack of evidence on that point, the circumstances at issue in this case bring it within rationale of Claridy. The present case only involved a state investigation

into violations of Virginia law, with assistance provided by an IRS agent who reviewed financial transactions related to the alleged state law violations and federal agents who assisted in executing the warrant. Assuming, _arguendo_, that the federal assistance rendered here is considered to be a "joint investigation," under _Claridy_, the issuance of the state search warrant did not initiate a federal proceeding and Rule 41 thus would not apply.

Moore's second argument that _Claridy_ does not apply here appears to be premised on a misreading of the Fourth Circuit's analysis. Moore attempts to draw a distinction between Maryland Code of Criminal Procedure § 1-203, which states that a search warrant shall be directed to a duly constituted police officer, Md. Code Ann., Crim. Proc. § 1-203(a)(3)(i) (emphasis added), and Virginia Code § 19.2-56, which states that a search warrant shall be directed to "the sheriff, sergeant, or any policeman of the county, city or town," Va. Code Ann. § 19.2-56(i) (emphasis added). Moore contends that, because the Fourth Circuit "utilized [Maryland] law in arriving at its decision," and because Virginia law is more restrictive, _Claridy_ should not control. Def.'s Reply in Supp. of Mot. to Suppress at 2.

The Fourth Circuit, however, did not use Maryland law in deriving the standard for applying Rule 41(b). Rather, the Court of Appeals made reference to the Maryland code provision

when it explained that "[b]ecause the warrant alleged violations of state law, the state judge's authority to issue the warrant and supervise its return was conferred by Maryland law [not by Rule 41]." Claridy, 601 F.3d at 283. ("Our conclusion that this was a state warrant proceeding governed by state law is consistent with the notion that Maryland confers authority to issue warrants independent of the authority conferred by Rule 41(b).").

For the foregoing reasons, Moore's alternative argument that Claridy does not apply is unpersuasive. Claridy, and the Fourth Circuit's previous cases, control the Court's determination of the Rule 41(b) issue. The law in this circuit necessitates denial of Moore's motion to suppress on the ground that the warrant did not comply with Rule 41(b)(1).

**B. Even if the Court Were to Determine that Rule 41(b) was Violated, Suppression is not Warranted**

Even if Moore's Rule 41(b)(1) argument had merit, and this Court were to find that Sgt. Ownby obtained the warrant in violation of the rule, suppression would not be warranted because any hypothetical violation was nonconstitutional and would not require suppression of the evidence. The Fourth Circuit discussed the difference between constitutional and non-constitutional, or ministerial, violations of Rule 41 in United States v. Simons, 206 F.3d 392 (4th Cir. 2000).

Generally, evidence collected in violation of the Fourth Amendment must be excluded from use at trial. See Mapp v. Ohio, 367 U.S. 643, 651-57 (1961). "Non-constitutional violations of Rule 41 warrant suppression only when the defendant is prejudiced by the violation, or when there is evidence of intentional and deliberate disregard of a provision in the Rule." Simons, 206 F.3d at 403 (internal citations and quotation marks omitted). Examples of non-constitutional violations include the government failing to return the warrant to a magistrate judge within the prescribed period of time, United States v. Smith, 914 F.2d 565, 568 (4th Cir. 1990), or a scrivener's error contained in a copy of the warrant given to the defendant, United States v. Wyder, 674 F.2d 224, 225-26 (4th Cir. 1982).

In Claridy, the Fourth Circuit concluded that, even if Rule 41(b) had been applicable to the search warrant in that case, the defendant's request for suppression would nonetheless be rejected because the purported violations of Rule 41(b) were nonconstitutional and nonprejudicial, and the defendant had presented no evidence that the purported violations were an intentional and deliberate effort to disregard or circumvent Rule 41. Claridy, 601 F.3d at 283-84; see also Simons, 206 F.3d at 403 ("[I]nsofar as the August search satisfied the requirements of the Fourth Amendment, i.e., it was conducted

pursuant to a warrant based on probable cause issued by a neutral and detached magistrate, we perceive no basis for concluding that the 45-day delay in notice rendered the search unconstitutional.").

Because the warrant in this case satisfied the requirements of the Fourth Amendment (in that it was based on probable cause as concluded *infra*), any violation of Rule 41(b) by Sgt. Ownby was nonconstitutional. And, in the case of a nonconstitutional violation, Moore had to show evidence that the violation has been prejudicial. He made no such showing. Instead, he rests his argument on a claim that Sgt. Ownby sought the state warrant as a pretext to search for evidence of federal offenses in an intentional and deliberate effort to disregard or circumvent Rule 41.

In support of his claim, Moore likens his case to the facts of United States v. Belcher, 577 F. Supp. 1241 (E.D. Va. 1983). In that case, the district court found that the search and seizure of arson evidence without a warrant directed to that end, while proceeding under a procedurally valid, but actually pretextual, search for evidence of gambling, violated the Fourth Amendment's protection from unreasonable searches. Id. at 1246. However, the circumstances in this case present a far different record from that in Belcher, where a Colonial Heights, Virginia police officer and a federal ATF agent had been "very busily"

engaged in investigating the arson of a building, a federal offense. _Id._ Eventually, the defendant became the prime suspect. _Id._ After arresting the defendant, the Colonial Heights police officer, who knew the defendant to be a local bookie and who noticed "football cards" used in gambling in the defendant's car, swore out a warrant to search the defendant's car and room on probable cause to believe that gambling paraphernalia would be found. _Id._

The district court concluded that "[t]he real purpose for the search warrant of the car was to justify a search warrant of the room and the real purpose of the search warrant of the room was to see if arson evidence could be found." _Id._ It "strain[ed] credulity," in the district court's estimation, to think that the Colonial Heights police officer and ATF agent, "having devoted the major part of their time . . . to an arson investigation, would one evening jointly depart from the arson investigation and run down a small gambling investigation for the purpose of upholding the gambling laws. Their purpose was to try to uphold the arson laws." _Id._ at 1247.

Unlike in _Belcher_, there is no indication here that Sgt. Ownby and Agent Rager devoted their time to a federal tax investigation from late-August 2007 to February 2008, and then, on a whim, Sgt. Ownby composed a nine-page affidavit detailing probable cause to search for evidence related to numerous

alleged state law violations, all as a pretext to search Club Velvet for evidence related to violations of the federal tax laws. In fact, it would appear that the time and resources spent by Sgt. Ownby, Agent Rager, Ms. Taylor, Mr. Geary, and the ABC investigators from late-August 2007 until February 2008 were devoted to corroborating CW-1's information and independently investigating the alleged narcotics, prostitution, and money laundering activities.

Thus, because the Court finds that Sgt. Ownby did not obtain the state search warrant in an intentional and deliberate effort to disregard or circumvent Rule 41, any hypothetical violation of Rule 41(b) would not warrant suppression of the evidence.

## 2. The Warrant did not Need to Assert Probable Cause for Violations of Federal Law Because the Warrant was Directed to Search for Evidence of Violations of State Law and the State Warrant was Supported by Probable Cause in the Affidavit

Moore next claims that the search warrant should be invalidated because it lacked a probable cause foundation for either federal or state offenses.

### A. Probable Cause was not Required for Federal Offenses

First, Moore argues that, because the warrant was federal in nature, it should have complied with Rule 41 and listed federal offenses with sufficient probable cause. Based on the reasoning discussed above, the Court finds that the search

warrant was directed toward searching and seizing evidence related to alleged violations of state law. Hence, listing federal offenses would have been neither necessary nor consistent with the intentions of state prosecutors and investigators. Therefore, the warrant need not have alleged federal offenses or provided sufficient probable cause to support a search for evidence related to federal offenses.

**B.    The Warrant Contained Sufficient Probable Cause for State Law Violations**

Moore also asserts that the warrant was invalid because the information from CW-1 was stale, the application lacked a sufficient foundation for CW-1's credibility and veracity, and the warrant failed to identify an underlying felony charge for the money laundering portion of the search.

In determining whether probable cause exists, the judge must make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Because "probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules," id. at

232, courts "give due weight to inferences drawn from [the] facts by resident judges and local law enforcement officers," Ornelas v. United States, 517 U.S. 690, 699 (1996). "[T]he crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." United States v. Lalor, 996 F.2d 1578, 1582 (4th Cir. 1993). Furthermore, the "probable cause standard does not 'require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause.'" United States v. Robinson, 275 F.3d 371, 380 (4th Cir. 2001) (quoting Taylor v. Farmer, 13 F.3d 117, 121-22 (4th Cir. 1993)).

Moore attacks the affidavit on the grounds that the information provided by CW-1 was stale because (1) Sgt. Ownby met with CW-1 in August 2007 but he did not apply for the warrant until February 2008; (2) CW-1's information dated back to the spring of 2006; and (3) even if the information was reliable in the spring of 2006, CW-1 provided "no further evidence connecting what she observed in 2006, to what was going

on at Club Velvet after she quit working there in 2007." Def.'s Mem. in Supp. of Mot. to Suppress at 20.

"Time is a crucial element of probable cause. A valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." United States v. McCall, 740 F.2d 1331, 1335-36 (4th Cir. 1984) (citation and internal quotation marks omitted). However, "[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit. Rather, [the court] must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." Id. at 1336 (internal citation and quotation marks omitted).

When presented to Judge Taylor, the search warrant application was accompanied by a single-spaced, nine-page affidavit composed by Sgt. Ownby, in which he detailed the statements and observations of CW-1. The affidavit also contained corroborating details provided by the ABC from its undercover investigation. Given the multiple allegations of criminal activity detailed by CW-1, and the length and nature of the activities, it is of no surprise that it would take some

time to confirm and corroborate the details that CW-1 provided to ensure that her evidence was reliable. In addition, ABC investigators required time to conduct their undercover operations and to gather additional evidence, and Agent Rager and Sgt. Ownby required time to review the financial documents subpoenaed by the MJGJ. Thus, the vitality of CW-1's statements cannot be tested solely with reference to the amount of time that passed between August 2007 and February 2008.

The affidavit contains the observations of CW-1 throughout an eighteen month period during which she worked at the club (the spring of 2006 through August 2007). In fact, CW-1 testified to the MJGJ in November 2007 about observations of crimes against nature that occurred in the club only a few weeks before her testimony. Moore's staleness argument also lacks merit because the ABC undercover operations, which continued up until approximately eleven days before the warrant's execution, yielded additional probable cause information and those observations corroborated certain details of CW-1's information. Therefore, Moore's argument that CW-1's information was stale is unsupported by the facts and circumstances of the investigation.

Moore next argues that the "affidavit did not support a finding that CW-1 was believable and that there was a factual basis for her knowledge." Def.'s Mem. in Supp. of Mot. to Suppress at 20. Moore focuses only on the fact that CW-1's

statements regarding drug distribution could only be corroborated one time during the ABC undercover operations. A second attempt was unsuccessful. Moore's contention, however, stands in contrast to the entirety of the information set out in the warrant application. Sgt. Ownby stated in the application that he was advised of the facts set forth in the affidavit in whole or in part by an informer, whose credibility or reliability could be determined based on the fact that she had "made statements against . . . her penal interest and ha[d] provide[d] information that ha[d] been corroborated by [him] through independent investigation." Gov't Ex. 1, p. 4. Furthermore, CW-1 provided her information face-to-face with Sgt. Ownby and the MJGJ, admitting to arranging prostitution at the club and selling heroin and cocaine to Moore.

There is no "simple rule" that covers all information supplied by informants, but the Fourth Circuit has distinguished between an informant who meets face-to-face with an officer, thereby providing the officer with an "opportunity to assess his credibility and demeanor" and exposing himself to accountability for making a false statement, and cases involving anonymous tipsters. <u>United States v. DeQuasie</u>, 373 F.3d 509, 523 (4th Cir. 2004); <u>see also</u> <u>United States v. Christmas</u>, 222 F.3d 141, 144 (4th Cir. 2000). CW-1 met twice with Sgt. Ownby, and testified before the MJGJ in November 2007, thereby providing

Sgt. Ownby, Ms. Taylor, and the grand jury with an opportunity to assess her credibility and demeanor. Moreover, CW-1 made statements against her penal interest, another indicia of reliability. See United States v. Harris, 403 U.S. 573, 583 (1971); United States v. White, 549 F.3d 946, 952 (4th Cir. 2008); see also United States v. Rose, 321 F. App'x 324, 326–27 (4th Cir. 2009) (unpublished) ("[T]hat the Informant's face-to-face statements to police were against his penal interest lends support to their veracity."). Thus, given the totality of the circumstances, including the information in the warrant application, CW-1's repeated face-to-face interviews with Sgt. Ownby and testimony before the MJGJ, and the corroboration of her information through the ABC undercover operations and Sgt. Ownby's independent investigation, this Court finds that CW-1's information and statements had sufficient indicia of reliability.

Finally, Moore claims that the money laundering charge in the search warrant application lacked a "felony" foundation. In part, the warrant directed officers to search and seize evidence related to Va. Code § 18.2-246.3, which states that "[i]t shall be unlawful for any person knowingly to conduct a financial transaction where the person knows the property involved in the transaction represents the proceeds of an activity which is punishable as a felony under the laws of the Commonwealth." Va.

Code Ann. § 18.2-246.3. In addition, the warrant directed officers to search and seize evidence related to Va. Code § 18.2-357, which provides that "[a]ny person who shall knowingly receive any money or other valuable thing from the earnings of any male or female engaged in prostitution, except for a consideration deemed good and valuable in the law, shall be guilty of pandering, punishable as a Class 4 felony." Va. Code Ann. § 18.2-357. Because the warrant directed a search in relation to an allegation that Moore may have received money from the earnings of a female engaged in prostitution, as alleged by CW-1 in the affidavit, which is punishable as a felony, there was a felony foundation laid in the warrant for the money laundering charge.

Thus, this Court finds that probable cause existed to support the search warrant.

## 3. The Warrant was not Fatally Overbroad

Moore next alleges that the evidence seized during the execution of the search warrant should be suppressed because the scope of the warrant was too broad. The Fourth Amendment instructs that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. The particularity requirement "ensures that a citizen is not subjected to 'a

general, exploratory rummaging in [his personal] belongings,'" United States v. Hurwitz, 459 F.3d 463, 470 (4th Cir. 2006) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)), and that nothing is left "to the discretion of the officer executing the warrant," Robinson, 275 F.3d at 381 (citing Marron v. United States, 275 U.S. 192, 196 (1927)). It requires only reasonable specificity based on common sense and a realistic assessment. United States v. Srivastava, 540 F.3d 277, 287 (4th Cir. 2008). But the test is a pragmatic one: "The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." United States v. Torch, 609 F.2d 1088, 1090 (4th Cir. 1979) (internal citation and quotation marks omitted).

The particularity requirement applies to the warrant, as opposed to the application or supporting affidavit submitted by the applicant. Hurwitz, 459 F.3d at 470 (citing Groh v. Ramirez, 540 U.S. 551, 557 (2004)). Thus, "[t]he fact that the application adequately described the 'things to be seized' does not save the warrant from its facial invalidity." Groh, 540 U.S. at 557 (emphasis supplied). The particularity requirement, however, may be satisfied by cross-reference in the warrant to separate documents that identify the property in sufficient detail. See id. at 557-58. "As a general rule, a supporting affidavit or document may be read together with (and considered

part of) a warrant that otherwise lacks sufficient particularity 'if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant.'" Hurwitz, 459 F.3d at 470-71 (quoting Groh, 540 U.S. at 557-58). In the Fourth Circuit, it is sufficient either for the warrant to incorporate the supporting document by reference or for the supporting document to be attached to the warrant itself. Id. at 471. The entire warrant should be reviewed as a whole. United States v. Washington, 852 F.2d 803, 805 (4th Cir. 1988). In this case, the nine-page affidavit is attached to the warrant as Attachment 4, and the list of items to be seized is incorporated by cross-reference as Attachment 3, as well as attached to the warrant itself.

The Fourth Amendment also requires that a warrant be no broader than the probable cause on which it is based. Hurwitz, 459 F.3d at 473. "Although the concept of probable cause resists an exacting definition, it 'exist[s] where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found' in a particular place." United States v. Perez, 393 F.3d 457, 461 (4th Cir. 2004) (quoting Ornelas, 517 U.S. at 696). "It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing

and adoption of the Fourth Amendment." Payton v. New York, 445 U.S. 573, 583 (1980) (footnote omitted).

Mindful of these standards, the warrant in this case was sufficiently particular and not overly broad based on the criminal activity alleged and described in the affidavit and warrant. Moore claims that the "any and all documents" language in the first clause of Attachment 3 makes this case comparable to that of United States v. Bridges, 344 F.3d 1010 (9th Cir. 2003), in which the Ninth Circuit held that a warrant containing a list of items and categories of property to be seized, while detailed, was "so expansive that its language authorize[d] the Government to seize almost all of [the defendant's] property, papers, and office equipment," id. at 1017. The warrant in Bridges, containing only the attachment listing the items to be seized and a description of the location of the defendant's offices, "delineat[ed] no clear material limitation or boundary as to its scope." Id. In addition, the warrant failed to state what criminal activity was being investigated by the IRS. Id. at 1018-19.

In comparison, the warrant issued to search Club Velvet was sufficiently particular and not overly broad. Though Attachment 3 contained generalized "any and all documents" language, it was limited in several ways, including (1) directing officers to search for evidence related to the specifically enumerated

violations of Virginia and City of Richmond law, (2) providing descriptive categorization of items in the attachment narrowed to relate to those specific offenses, the defendant, and his business entities, (3) and explaining in the affidavit the details of Moore's alleged violations state law. Taken together, these limits on the generalized "any and all documents" language demonstrate that the warrant was sufficiently particular and not overly broad based on the criminal activity alleged and the items to be seized.

In addition, these same limitations, especially the list of crimes and Sgt. Ownby's affidavit, provide context for the reasonable bounds of the time frame relating to the criminal activity. Based on the particular facts set forth in the affidavit, see Srivastava, 540 F.3d at 287, specifically those relating to CW-1, it is reasonable to infer that Moore's criminal activities relating to drugs, prostitution, and money laundering were part of an ongoing course of conduct that began before CW-1's arrival as an exotic dancer at Club Velvet.

Furthermore, a search warrant does not fail the particularity requirement by not explicitly articulating a time frame, as claimed by Moore. He contends that the warrant's list of items to be seized is overbroad because the list does not specify time frames related to the documentary evidence. The Fourth Amendment, however, "specifies only two matters that must

be 'particularly describ[ed]' in the warrant: 'the place to be searched' and 'the persons or things to be seized.'" <u>United States v. Grubbs</u>, 547 U.S. 90, 97 (2006) (alteration in original). Thus, failure to list a time frame for the documentary evidence does not render the warrant overbroad.

In summary, in reviewing the entire warrant, including Attachment 3 and the affidavit in Attachment 4, the Court concludes that the warrant was not fatally overbroad.

**4. Seized Items not Specifically Identified in the Attachment to the Warrant Should not be Suppressed**

Finally, Moore alleges that the ATM machines and records, income tax returns, Daily Sheets, and any other documentation and evidence were not specifically identified in the search warrant and thus their seizure exceeded the scope of the search warrant. Def.'s Reply in Supp. of Mot. to Suppress at 6. Further, Moore urges suppression of all evidence seized pursuant to the warrant, <u>i.e.</u>, blanket suppression, because the circumstances surrounding the execution of the warrant at Club Velvet are different from those in <u>United States v. Hargus</u>, 128 F.3d 1359 (10th Cir. 1997), wherein the Tenth Circuit found that though officers seized items outside the scope of a warrant, suppression was not warranted because the constraints of executing the warrant made it impracticable to sort through improperly seized filing cabinets on-site and no improperly

seized item was admitted against the defendant at trial, <u>id.</u> at 1363. Moore contends that, because neither of those circumstances are present in his case, the Court should find that the officers grossly exceeded the scope of the warrant, thereby undermining the particularity requirement and transforming the warrant into a general warrant that requires blanket suppression of the evidence.

A search is not invalidated in its entirety because some seized items were not identified in the warrant:

> Rather, invalidation of an entire search based on a seizure of items not named in the warrant is an "extraordinary remedy" that "should be used only when the violations of the warrant's requirements are so extreme that the search is essentially transformed into an impermissible general search." <u>United States v. Chen</u>, 979 F.2d 714, 717 (9th Cir. 1992). Put another way, searching officers may be said to have flagrantly disregarded the terms of a warrant when they engage in "indiscriminate fishing" for evidence. <u>Id.</u> For example, the Tenth Circuit affirmed a finding of flagrant disregard when law enforcement officers, acting pursuant to a warrant that authorized seizure of marijuana and several specifically identified firearms, seized "anything of value," including televisions, VCRs, stereos, a lawn mower, cameras, a clock radio, and a screw-driver set. <u>United States v. Foster</u>, 100 F.3d 846, 848 & n.1, 850-51 (10th Cir. 1996).

<u>United States v. Robinson</u>, 275 F.3d 371, 381-82 (4th Cir. 2001). In this case, items not specifically identified in the search warrant attachment were not improperly seized. Category Two in

Attachment 3, for example, lists "[b]ooks, records, invoices, receipts, . . . personal property transactions and related records, . . . United States Currency, and other items evidencing the obtaining, secreting, transferring, and/or concealment of assets and the obtaining, secreting, transferring, concealment and/or expenditure of money. Additionally, any and all documents, business records, and financial records that, by their nature reveal an attempt to disguise and conceal the true nature of a prostitution business." Gov't Ex. 1, p. 8. The Daily Sheets, Dance Watcher Book, ATMs, ATM records, and tax returns reasonably fall within this category because they all relate to Moore's alleged failure to report all of his income from Club Velvet to his accountant, who prepared his tax returns for the years at issue in the Superseding Indictment. These items also could be seized pursuant to the category that lists "[d]ocuments relating to the expenses associated with the ongoing operations of the businesses listed herein, including payroll records, tax bills and records, . . . and any other associated business expenses." Id. at 9. The warrant also includes Attachment 4, the supporting affidavit that, for example, contained references to Moore's practice of replenishing the ATM machines with personal cash, and which would have informed the officers' search for items listed in Attachment 3. Finally, Moore has presented no

evidence, other than listing alleged improperly seized items, that the officers engaged in indiscriminate fishing during the search that would require blanket suppression of the evidence.

Thus, this Court finds that items seized during execution of the search warrant that were not specifically identified in the warrant and its supporting attachments did not exceed the scope of the warrant. Moore's motion to suppress on this ground, thus, is denied.

## CONCLUSION

Based on the foregoing, the Defendant's MOTION TO SUPPRESS (Docket No. 9) is denied.

It is so ORDERED.

/s/     REP
_____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: March 30, 2011